2014 IL App (1st) 143316
No. 1-14-3316
Opinion filed September 9, 2015

THIRD Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* DESHAWN G., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 14JD02 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| DESHAWN G., a Minor, | ) | Stuart P. Katz, |
| | ) | Judge, presiding. |
| Respondent-Appellant.) | ) | |

_____

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Howse and Cobbs concurred in the judgment and opinion.


**OPINION**

¶ 1    This appeal arises from the trial court's October 2014 order following a jury trial adjudicating respondent-appellant Deshawn G. to be a violent juvenile offender and sentencing him to the Department of Juvenile Justice (DOJJ) until the age of 21, pursuant to the mandatory sentencing provision of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5-820 (West 2012)).  That provision of the Act applies upon a minor's second finding of

delinquency for an offense that, in an adult case, "would have been a Class 2 or greater felony[,] involving the use or threat of physical force or violence," or which involves a firearm. 705 ILCS 405/5-820 (West 2012).

¶ 2     Respondent was adjudicated delinquent based on a petition alleging three counts of aggravated unlawful use of a weapon (AUUW) based on his lack of a valid Firearm Owner's Identification (FOID) card; his age (under 21 years old); and his prior felony conviction. Based on the prior adjudication of delinquency for aggravated robbery (a Class 1 offense) and the Class 2 nature of the current offenses which were based upon a prior AUUW conviction, the State filed a notice of intent to prosecute respondent as a violent juvenile offender (VJO) under section 5-820 of the Act (705 ILCS 405/5-820 (West 2012)). After a jury trial, respondent was adjudicated delinquent of two counts of AUUW based on his lack of a valid FOID card and his youth. Respondent was later sentenced to a mandatory term of confinement until age 21. Respondent appeals, contending: (1) the subsections of the AUUW statute under which he was convicted are not severable from the section of the AUUW statute that was found unconstitutional in *People v. Aguilar*, 2013 IL 112116, and are, therefore, themselves unconstitutional; (2) the violent juvenile offender provision of the Juvenile Court Act under which respondent was sentenced is unconstitutional; (3) the admission of a certification alleging respondent's lack of a valid FOID card, prepared by a non-testifying witness, violated his right to confrontation; and (4) respondent's adjudications of delinquency for AUUW based on the lack of a valid FOID card and possessing a firearm while under age 21 violated the one-act, one-crime doctrine. For the following reasons, we

vacate respondent's adjudication for AUUW based on the lack of a FOID card, and affirm in all other respects.[1]

¶ 3                                            I. BACKGROUND

¶ 4            In January 2014, the State filed a petition for adjudication of wardship for respondent's possession of a firearm on New Year's Eve 2013. Through the petition, the State alleged three Class 2 felony counts of aggravated unlawful use of a weapon: count I for possessing a firearm without a firearm owner's identification card under section 24-1.6(a)(3)(C) of the Criminal Code of 2012 (the Code) (720 ILCS 5/24-1.6(a)(3)(C) (West Supp. 2013)); count II for possessing a firearm while under age 21 and not engaged in lawful activities under the Wildlife Code under section 24-1.6(a)(3)(I) of the Code (720 ILCS 5/24-1.6(a)(3)(I) (West Supp. 2013); and count 3 for possessing a firearm while having a prior adjudication of delinquency for a crime that would be a felony if committed by an adult under section 24-1.6(a)(3)(D) of the Code (720 ILCS 5/24-1.6(a)(3)(D) (West Sup. 2013)). Prior to trial, the State *nolle prosquei*'d the unlawful possession of a firearm and the AUUW based on the prior adjudication, and the cannabis possession charge was stricken.

¶ 5            Prior to trial, the State filed written notice that it intended to prosecute 16-year old respondent as a violent juvenile offender pursuant to section 5-820 of the Act (705 ILCS 405/5-820 (West 2012)) because the instant offense was a Class 2 felony and he had a prior June 2012 adjudication of delinquency for the Class 1 felony of aggravated robbery. Respondent then filed motions to dismiss the VJO petition, alleging (1) his prior adjudications of delinquency were not equivalent to convictions so as to classify his current AUUW charges as Class 2 felonies, thus making him subject to the VJO statute; and (2) that

---

[1] We initially filed this decision as an unpublished order. We file this opinion now after granting the State's subsequent motion to publish.

prosecution under the VJO statute represents an improper double enhancement. Respondent also filed motions to strike the Class 2 designation of the AUUW counts, alleging that the prior AUUW adjudication upon which they are based was unconstitutional based on *People v. Aguilar*, 2013 IL 112116, and that it was unclear which counts formed the basis for the prior AUUW adjudication. Following a hearing, the trial court denied these motions.

¶ 6 Respondent also moved *in limine* to bar the State from introducing a certification from the Illinois State Police firearm services bureau database which indicated that respondent had never been issued a FOID card. The trial court denied the motion, ruling that the document was a "signed and sworn" self-authenticating certification.

¶ 7 The State proceeded to trial on counts I (possession of a firearm without a firearm owner's identification card under section 24-1.6(a)(3)(C) of the Code (720 ILCS 5/24-1.6(a)(3)(C) (West Supp. 2013)) and count II (possession of a firearm while under age 21 and not engaged in lawful activities under the Wildlife Code under section 24-1.6(a)(3)(I) of the Code (720 ILCS 5/24-1.6(a)(3)(I) (West Supp. 2013)).

¶ 8 Respondent had a jury trial. At trial, Chicago Police officer Reginald Weatherly testified that on December 31, 2013, he was in uniform traveling in an unmarked police vehicle with three other police officers. The officers were conducting a safety mission in the vicinity of 45th Street and Ellis Avenue in Chicago. He described a safety mission is "where we have the majority of our team or all the officers in the districts ride on New Year's Eve because we have a higher volume of calls for shots fired, so we'll ride four men to a car."

¶ 9 It was a snowy night, and the streets were covered in snow. Around 9:50 p.m., the officers saw a "group of guys" walking along the sidewalk and in the street. The area was lit by regular streetlights. Recognizing some of the individuals, including respondent, Officer

Weatherly pulled up near the group and told them to slow down. Some stopped, but one person, whom Officer Weatherly identified in court as respondent, continued walking. Officer Weatherly addressed respondent by his street nickname, saying, "What's up Slushy?" Respondent was the only person in the group not wearing a coat. Officer Weatherly asked respondent, "You're not speaking today, Slushy?" Respondent looked at the officer and continued walking. Officer Weatherly then cracked his car door in order to get out of the car, and respondent fled.

¶ 10       As respondent ran, Officer Weatherly noticed that respondent was holding his side by his hip and pocket. Based on prior experience, then, Officer Weatherly believed respondent had a gun. Officer Weatherly attempted to restrain some of the other individuals in the group who were running into the street. As he was doing so, he looked at respondent and saw him fall. Officer Weatherly saw his partner, Officer Marcus Duncan, running toward respondent. A short while later, Officer Duncan returned carrying a handgun. Soon after, backup officers arrived, who eventually detained respondent. Officer Weatherly traveled to where respondent was being detained and indentified respondent as the person who ran from him earlier. Officer Weatherly testified that Officers Duncan, Hunt, and St. Andrew identified respondent, as well. On cross-examination, Officer Weatherly agreed that he never saw respondent with the handgun. Officer Weatherly testified that respondent did not produce a FOID card.

¶ 11       Officer Duncan testified to much of the same activity as did Officer Weatherly. In addition to corroborating testimony, Officer Duncan testified that when Officer Weatherly called out to respondent, respondent picked up his pace, first walking faster and then running. At that point, Officer Duncan exited the squad car and watched respondent. There was

nothing between himself and respondent that would have blocked his vision. The street lighting was such that Officer Duncan had no difficulty seeing respondent's face. While Officer Duncan watched, respondent lost his footing and fell to the ground. When he stood up, Officer Duncan saw respondent look left and right, and then bend down, extending his right arm into the snow. Officer Duncan began chasing after respondent. When Officer Duncan reached the spot where he had seen respondent reach into the snow, he saw a "nine millimeter handgun sticking out of the snow with the butt facing up." The only other impression in the snow was a handprint. Officer Duncan retrieved the weapon, noting that it was fully loaded. Officer Duncan later identified respondent as the individual he had seen reach into the snow.

¶ 12    The State introduced respondent's birth certificate, showing he was born in 1997, and therefore was 16 years old at the time of the crime. The State also introduced, over respondent's objection, a document from the Illinois State Police certifying that respondent had never been issued a Firearm Owners Identification Card.

¶ 13    Respondent rested without testifying and without putting on any evidence.

¶ 14    The jury found respondent guilty of both counts of AUUW, one based on possessing a firearm without a valid FOID card and the other for possessing a firearm while under the age of 21. At a later dispositional hearing, the State introduced certified copies of respondent's prior felony convictions for AUUW (2013); and aggravated robbery, robbery, aggravated battery, and theft from person (2012). The State asked the trial court to sentence respondent as a violent juvenile offender with a sentence to "at least 21 years of age." Defense counsel renewed respondent's challenges to the VJO statute, but acknowledged that the trial court had previously ruled on the motions in which he objected to the VJO statute. The trial court

sentenced respondent under the VJO statute to a mandatory term of confinement until the age of 21, noting that respondent would receive day-for-day good conduct credit.

¶ 15       Respondent appeals his adjudication and sentence.

¶ 16                              II.  ANALYSIS

¶ 17                        i.  Respondent's Severability Claim

¶ 18       On appeal, respondent first contends that his adjudications for aggravated use of a weapon under section 24-1.6(a)(3)(C) and (a)(3)(I) are unconstitutional.  Specifically, respondent contends that because section (a)(3)(A) of the AUUW statute was struck down in *Aguilar* as unconstitutional, and sections (a)(3)(C) and (a)(3)(I) of the AUUW statute under which he was adjudicated are not severable from the portion that was struck down, sections (a)(3)(C) and (a)(3)(I) of the AUUW statute are also unconstitutional.  Therefore, argues respondent, his two AUUW adjudications should be reversed.  Specifically, he argues:  "In *People v. Aguilar*, subsection (a)(3)(A) of the AUUW statute was declared unconstitutional on its face.  [Citation.]  That provision spoke to the essential conduct protected by the Second Amendment—bearing a loaded firearm outside the home for self-defense.  Because the *Aguilar* provision concerned the very act at the heart of the AUUW statute, and because that act cannot be criminalized, the provisions defining other versions AUUW, including subsections (a)(3)(C) and (a)(3)(I), are not severable from the provision struck down by *Aguilar*.  This court should reverse [respondent's] adjudications as the two provisions of the AUUW statute are unconstitutional."  For the following reasons, we disagree.

¶ 19       On July 9, 2013, the Illinois General Assembly enacted the Firearm Concealed Carry Act, which, in part, "amended the AUUW statute to allow for a limited right to carry certain

firearms in public. See Pub. Act. 98-0063 (eff. July 9, 2013) ***." *Aguilar*, 2013 IL 112116, ¶ 22 n.4.

¶ 20    In *Aguilar*, our supreme court considered the constitutionality of section (a)(3)(A) of the preamendment version of the AUUW statute. The court held that the Class 4 form of AUUW as set forth in section 24-1.6(a)(1), (a)(3)(A), (d) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008))—the preamendment version of the statute which "categorically prohibit[ed] the possession and use of an operable firearm for self-defense outside the home"—violated the second amendment. *Aguilar*, 2013 IL 112116, ¶¶ 21-22.

¶ 21    In the case at bar, respondent committed the AUUW on December 31, 2013. This was nearly six months after July 9, 2013, the day the amended statute took effect. The *Aguilar* court made it exceedingly clear that its decision only affected the *preamended* AUUW statute. See *Aguilar*, 2013 IL 112116, ¶ 22 fn4 ("Neither the Firearm Concealed Carry Act nor the amended AUUW statute is at issue in this case."). Respondent's argument, therefore, fails insofar as it is based entirely on *Aguilar* and its progeny, as *Aguilar* does not apply to the crime at hand.

¶ 22    Moreover, even if *Aguilar* did apply to respondent's crime and we were to consider this issue on the merits, since the filing of the briefs herein, our supreme court has issued two opinions resolving this issue. *People v. Mosley*, 2015 IL 115872; *In re Jordan G.*, 2015 IL 116834. In those opinions, the court found subsections (a)(3)(C) and (a)(3)(I) do not violate the second amendment, and held that subsections (a)(3)(C) and (a)(3)(I) are severable from the provision found to be unconstitutional in *Aguilar*. *Mosley*, 2015 IL 115872, ¶¶ 27-31; *In re Jordan G.*, 2015 IL 116834, ¶¶ 16-19. Respondent acknowledges that this court is bound

by *Mosley* and *In re Jordan G.*, but argues that both opinions were decided incorrectly. Respondent is correct that we are bound by the *Mosley* and *In re Jordan G.* decisions.

¶ 23                    ii.  The Constitutionality of the Violent Juvenile Offender Provision

¶ 24        Next, respondent contends the provision under which he was adjudicated, the violent juvenile offender provision of the Act, is unconstitutional because it removes the sentencing court's discretion in sentencing minors.  Relying on *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), respondent asserts that the VJO provision has many constitutional infirmities.

¶ 25                    A.  Respondent's Facial Challenge to the VJO Provision

¶ 26        In addressing a challenge to the constitutionality of a statute, we begin with the presumption that the statute is constitutional.  See *People v. Greco*, 204 Ill. 2d 400, 406 (2003); accord *People v. Malchow*, 193 Ill. 2d 413, 418 (2000).  If reasonably possible, a court must construe the statute so as to uphold its constitutionality and validity.  *Greco*, 204 Ill. 2d at 406; *People v. Cosby*, 305 Ill. App. 3d 211, 224 (1999) (we must affirm statute's constitutionality and validity whenever possible).  The party challenging the statute's constitutionality has the burden of demonstrating its invalidity.  *Greco*, 204 Ill. 2d at 406. "Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances.  The invalidity of the statute in one particular set of circumstances is insufficient to prove its facial invalidity."  (Emphasis in original.)  *In re M.T.*, 221 Ill. 2d 517, 536-37 (2006).

¶ 27        The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature.  *People v. McChriston*, 2014 IL 115310, ¶ 15.  "The best evidence of

legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning." *People v. Woods*, 193 Ill. 2d 483, 487 (2000). "In construing a statute, a court may also consider the reason and necessity for the law, the evils to be remedied, and the objects and purposes to be obtained." *Woods*, 193 Ill. 2d at 487. In examining the constitutionality of a statute, our review is *de novo*. *Woods*, 193 Ill. 2d at 487.

¶ 28    While the purpose of the Act is the rehabilitation of the minor (705 ILCS 405/5-101(c) (West 2012)), the purpose and policy section of the Juvenile Court Act has been amended to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law, and equip juvenile offenders with competencies to live responsibly and productively (705 ILCS 405/5-101 (West 2012)). Enumerated purposes of the Act now include to "protect citizens from juvenile crime," and to "hold each juvenile offender directly accountable for his or her acts." 705 ILCS 405/5-101(1)(a), (b) (West 2012). Our supreme court has recognized that these amendments "represent a *** shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and of holding juveniles accountable for violations of the law." *In re J.W.*, 204 Ill. 2d 50, 69 (2003).

¶ 29    In his arguments, respondent relies almost exclusively on a developing line of United States Supreme Court cases including *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); and *Roper v. Simmons*, 543 U.S. 551 (2005), arguing these cases hold that fundamental differences between juvenile and adult minds make children under 18 less culpable than adults for the same offenses and, thus, asserting that additional constitutional protections for these juvenile offenders are required. The Supreme Court held in *Roper* that the eighth amendment forbids the death penalty for

juvenile offenders, finding that they "cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569. Next, it found in *Graham* that the eighth amendment prohibits a sentence of life without the possibility of parole for juveniles who did not commit homicide. See *Graham*, 560 U.S. at 74-75. These holdings culminated in *Miller*, wherein the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, including those convicted of homicide, stating that a judge must first have the opportunity to examine the circumstances involved. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶ 30          The Violent Juvenile Offender provision provides, in pertinent part:

"(a) Definition. A minor having been previously adjudicated a delinquent minor for an offense which, had he or she been prosecuted as an adult, would have been a Class 2 or greater felony involving the use or threat of physical force or violence against an individual or a Class 2 or greater felony for which an element of the offense is possession or use of a firearm, and who is thereafter adjudicated a delinquent minor for a second time for any of those offenses shall be adjudicated a Violent Juvenile Offender if:

(1) The second adjudication is for an offense occurring after adjudication on the first; and

(2) the second offense occurred on or after January 1, 1995.

(b) Notice to minor. The State shall serve upon the minor written notice of intention to prosecute under the provisions of this Section within 5 judicial days of the filing of a delinquency petition, adjudication upon which would mandate the minor's disposition as a Violent Juvenile Offender.

* * *

(d) Trial. Trial on the petition shall be by jury unless the minor demands, in open court and with advice of counsel, a trial by the court without a jury.

* * *

(f) Disposition. If the court finds that the prerequisites established in subsection (a) of this Section have been proven, it shall adjudicate the minor a Violent Juvenile Offender and commit the minor to the Department of Juvenile Justice until his or her 21st birthday, without possibility of aftercare release, furlough, or non-emergency authorized absence. However, the minor shall be entitled to earn one day of good conduct credit for each day served as reductions against the period of his or her confinement. The good conduct credits shall be earned or revoked according to the procedures applicable to the allowance and revocation of good conduct credit for adult prisoners serving determinate sentences for felonies.

For purposes of determining good conduct credit, commitment as a Violent Juvenile Offender shall be considered a determinate commitment, and the difference between the date of the commitment and the minor's 21st birthday shall be considered the determinate period of his or her confinement." 705 ILCS 405/5-820 (West 2012).

¶ 31 Respondent claims a number of deformities with the VJO provision. We take each one in turn herein.

¶ 32 a. Equal Protection and Substantive Due Process

¶ 33 Relying on *Miller*, respondent contends the VJO provision violates due process because there is no rational basis related to the legitimate government interest expressed in the Act. Specifically, respondent argues that the "one-size-fits-all arbitrary sentence" scheme

12

of the VJO violates his substantive due process rights as provided in the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). He argues: (1) requiring juveniles who have been designated as violent juvenile offenders to be committed to the DOJJ until their 21st birthday does not serve the goal of protecting citizens from juvenile crime; (2) the mandatory period of commitment until age 21 is contrary to the purpose of holding each juvenile accountable for his own acts where, for example here, respondent "was with a group of friends, and influenced by his gang membership, demonstrating that his circumstances—not personality—were at the root of his criminality;" (3) the VJO provision is in "direct opposition" to the Act's stated purpose of providing an individualized assessment of each individual because, once a juvenile is designated a violent juvenile offender, a sentencing court has no discretion in fashioning the juvenile's sentence; and (4) the VJO provision does not further the goal of providing due process where children are constitutionally different from adults for purposes of sentencing.

¶ 34      Respondent "acknowledges that the United States Supreme Court has not yet considered whether juveniles have a due process right to individualized consideration at sentencing," but argues that, "under the reasoning of *Miller*, *Graham*, and *Roper*, it seems evident that such consideration is necessary to ensure that juveniles receive due process."

¶ 35      Respondent also argues the VJO provision violates the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2) because it treats younger juveniles more harshly than older juveniles, which is "contrary to the idea of lessened culpability for the youngest juvenile offenders as discussed in *Miller*." When the courts treat both younger and older juvenile offenders as violent juvenile offenders, the process unconstitutionally results in younger juveniles designated as violent offenders

13

always having longer incarceration times than older juveniles designated as violent offenders. Respondent posits this unequal treatment serves no legitimate government purpose and, therefore, violates equal protection guarantees.

¶ 36     The due process clause of the United States Constitution provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, § 1.  Similarly, the due process clause of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."  Ill. Const. 1970, art. I, § 2.  " 'Under substantive due process ***, a statute is unconstitutional if it impermissibly restricts a person's life, liberty or property interest.' "  *People v. Johnson*, 225 Ill. 2d 573, 584 (2007) (quoting *People v. R.G.*, 131 Ill. 2d 328, 342 (1989)).

¶ 37     The equal protection analysis is the same under either the Illinois or United States Constitution. *People v. Shephard*, 152 Ill. 2d 489, 499 (1992); U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2. The equal protection clause "guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 116. This guarantee allows the legislature to create distinctions between different groups of people as long as that distinction avoids "criteria wholly unrelated to the legislation's purpose." *In re Jonathon C.B.*, 2011 Ill. 107750, ¶ 116. The parties here agree that respondent's equal protection claim is governed by the rational basis test. This test simply inquires whether the method or means employed by the statute to achieve the stated goal or purpose of the legislation are rationally related to that goal. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 116. The court will not make this rational basis inquiry, however, until the movant proves he is similarly situated to the comparison group. *People v. Masterson*, 2011 IL 110072, ¶ 25. If a

movant cannot meet this preliminary threshold, the equal protection claim fails. *People v. Whitfield*, 228 Ill. 2d 502, 513 (2007).

¶ 38     This court has previously addressed and rejected both a due process and an equal protection challenge to the VJO provision of the Act. In *In re M.G.*, 301 Ill. App. 3d 401 (1998), the First District, Fifth Division of this court rejected a due process challenge to the VJO statute. *In re M.G.*, 301 Ill. App. 3d at 407. We considered *People ex rel. Carey v. Chrastka*, 83 Ill. 2d 67 (1980), in which our supreme court rejected the challenging minors' arguments that the Habitual Juvenile Offender Act violated due process, and determined that the same reasoning should apply to the challenging minor's allegations regarding the VJO statute. *In re M.G.*, 301 Ill. App. 3d at 407-08. We recognized that the legislature has the authority to establish minimum sentences for juveniles. *In re M.G.*, 301 Ill. App. 3d at 407. We observed that it was " 'entirely reasonable and constitutionally permissible' " for the legislature to conclude that juveniles who have committed two serious violent offenses within a short period of time should be subject to mandatory confinement to the age of 21. *In re M.G.*, 301 Ill. App. 3d at 407 (quoting *Chrastka*, 83 Ill. 2d at 80). We held:

> "We find M.G.'s distinction between the two statutes [(the Violent Juvenile Offender provision and the Habitual Juvenile Offender Act)] unpersuasive. *Chrastka* establishes that neither of the constitutional provisions cited is violated merely because the legislature mandates a disposition in certain situations. While legislative action may limit the courts' discretion, it is not necessarily unconstitutional. The limitation of the courts' role can be remedied by the legislature's treatment of the subject. Indeed, the issues of seriousness of the

offense and rehabilitation have apparently already been considered in the disposition set by the legislature in the Violent Juvenile Offender Act.

*** [T]he legislature could legitimately conclude that an individual who has committed two serious violent offenses has benefited little from the rehabilitative measures of the juvenile court system and exhibits little prospect for restoration to meaningful citizenship within that system. The rehabilitative purposes of the system are not forsaken but, after the commission of a second serious offense, the interest of society's protection receives additional consideration. We hold it constitutionally permissible for the legislature to authorize the disposition specified in the Violent Juvenile Offender Act." *In re M.G.*, 301 Ill. App. 3d at 408.

¶ 39    We note here that, in his reply brief, respondent acknowledges *In re M.G.,* but argues that we should not follow it because it relied upon "*Chrastka*'s unsound logic" which should no longer be followed in light of *Roper*, *Graham*, and *Miller*. Respondent quotes at length a recent decision of the Third Division of this court, *In re Shermaine S.*, 2015 IL App (1st) 142421, which upheld the habitual juvenile offender provision of the Juvenile Court Act while at the same time expressing reservations about its constitutionality. In that decision, the court rejected a juvenile's reliance on *Miller* to challenge the continuing validity of *Chrastka*, finding *Miller* distinguishable because it involved defendants who committed crimes as juveniles but were charged and convicted in the adult court system. *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶¶ 18-22. Additionally, the court expressly noted that, as an appellate court, it was "compelled" to follow the supreme court precedent established in *Chrastka*, 83 Ill. 2d at 81, which had previously upheld the constitutionality of

the habitual offender mandatory sentencing provision of the Act. *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 1. It stated:

"We note, however, that the mandatory sentencing provision of the Act, which removes all discretion of the trial court in sentencing certain repeat juvenile offenders, is ripe for reconsideration. Illinois has been a national leader in the field of juvenile justice since the Illinois legislature enacted 'An Act to regulate the treatment and control of dependent, neglected and delinquent children' (1899 Ill. Laws 131)—or the Illinois Juvenile Court Act—on July 1, 1899. The first juvenile court in the country was located in Chicago across the street from Hull House, an effective and prominent social service agency founded by social reformer Jane Addams. It was Addams who rallied the movement for a separate juvenile justice system, which would remove children from being tried and imprisoned by the adult criminal system. And it was Addams who cautioned, 'social advance depends as much on the process through which it is secured as upon the result itself.' Jane Addams, *Peace and Bread in Time of War*, 133 (1922).

During the intervening decades, however, the pendulum has swung back and forth on the legal system's handling of juvenile offenders as adults. Recent research on the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions warrants reconsideration of some provisions of the Act, particularly those that remove or reduce the trial judge's discretion in considering some of those qualities and characteristics in sentencing a juvenile. We must ask ourselves whether precluding a trial judge's discretion

17

wrongly deprives juveniles of what Justice Kennedy's majority opinion in *Graham v. Florida*, 560 U.S. at 79, 130 S. Ct. 2011, called 'the opportunity to achieve maturity of judgment and self-recognition of human worth and potential.'

As our supreme court recently noted in *People v. Patterson*, 2014 IL 115102, [***], in discussing automatic transfers of juveniles to adult court, '[w]hile modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions [citation], the automatic transfer provision does not. Indeed, the mandatory nature of that statute denies this reality.' *Patterson*, 2014 IL 115102, ¶ 111 [***]. The court 'strongly urge[d] the General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceeding in these juvenile cases.' *Id.* We suggest that similar reconsideration is necessary in the context of the Act's habitual offender provision to ensure preservation of the fundamental purpose of juvenile proceedings—the child's rehabilitation, treatment, and welfare." *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶¶ 32-34.

¶ 40    Although we recognize that the Third Division of this court expressed discomfort with *Chrastka*, we also recognize, as it did, that it was bound by the supreme court opinion in *Chrastka*. We, too, are bound by that opinion, and we, too, decline respondent's invitation to disregard appellate decisions crafted in reliance on that opinion.

¶ 41    Respondent also urges us to decide that *In re M.G.*, in which this court already determined the VJO provision was constitutional, is no longer valid due to the recent line of

Supreme Court cases including *Roper*, *Graham*, and *Miller*. We decline to do so, however, as our supreme court has recently instructed that those decisions are closely limited to the "most severe of all criminal penalties" such as life without parole. See *People v. Patterson*, 2014 IL 115102, ¶ 110. In this case, 16-year-old respondent was sentenced to a mandatory term of confinement until the age of 21, with the possibility of day-for-day good conduct credit, a sentence which is a far cry from "the most severe of all penalties." In *Patterson*, our supreme court, in pertinent part, upheld the automatic transfer provision of the Act (705 ILCS 405/5-130 (West 2008)) and defined the limitations of the *Roper*, *Graham*, and *Miller* line of cases. *Patterson*, 2014 IL 115102, ¶ 89. To that extent, we find the court's discussion of the matter worth inclusion here:

> "Finally, defendant suggests that, at a minimum, the combination of the transfer statute and the applicable sentencing provisions is unconstitutional as applied to non-homicide offenders because they are 'categorically less deserving of the most serious forms of punishment than are murderers.' *Graham*, 560 U.S. at 69. Because defendant did not kill or intend to kill, he claims he has a 'twice diminished moral culpability' and does not deserve the most severe punishments. [Citation.] Defendant asserts that youthfulness must be considered whenever 'a harsh adult sentence' is given to a minor because juveniles' distinctive traits are not crime-specific, citing *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465. In support, defendant also cites [*People v.*] *Leon Miller*, [202 Ill. 2d 328, 340-41 (2002)], where this court found the imposition of a mandatory life sentence on a 15-year-old convicted of two counts of first degree murder based on accountability after

19

an automatic transfer to adult court unconstitutional because the youth's age and personal culpability were never considered.

Here, defendant was sentenced to 12 years in prison on each of three counts of aggravated criminal sexual assault. The sentences were required to be served consecutively (730 ILCS 5/5-8-4(a)(ii) (West 2008)), and defendant was statutorily mandated to serve at least 85% of his total prison term (730 ILCS 5/3-6-3(a)(2)(ii) (West 2008)), or 30 years, 7 months. Although lengthy, that term is not comparable to either the death penalty or ' "the second most severe penalty permitted by law,' " life in prison without parole (*Graham*, 560 U.S. at 69 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.))). The Supreme Court has clearly distinguished the latter sentences from any others, noting both the uniqueness of the ' "severity and irrevocability' " of the death penalty and the 'characteristics with death sentences that are shared by no other sentences' besides life without parole. *Graham*, 560 U.S. at 69 (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). The Supreme Court has also instructed that '[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime,' but only to give those offenders 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' expressly leaving the specific mechanism and means to each state. *Graham*, 560 U.S. at 75. Most recently, in *Miller* the Court reiterated the *Graham* rationale and emphasized the 'unprecedented' nature of the Court's expansion of its categorical

ban to the imposition of life without parole for juveniles in nonhomicide cases. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466.

Similarly, this court has unanimously declined to expand the narrow rule in *Graham* to all juveniles sentenced to life without parole for homicides. *Davis*, 2014 IL 115595, ¶¶ 48-49. Although defendant relies on *Leon Miller*, that decision is inapposite. There, we described the minor defendant as 'the least culpable offender imaginable,' having been convicted of two murders solely on the theory of accountability. Nonetheless, he was subject to mandatory life in prison with no possibility of parole. *Leon Miller*, 202 Ill. 2d at 341. In our ruling, we focused on the particular harshness and obvious lack of proportionality of that sentence in light of the unique facts of the case. We expressly:

> 'agree[d] with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole—the same sentence applicable to the actual shooter.' *Leon Miller*, 202 Ill. 2d at 341.

Nonetheless, we refrained from barring the imposition of a life sentence on any juvenile offender, denying any implication 'that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never

21

appropriate.'  As we explained, '[i]t is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate.'  *Leon Miller*, 202 Ill. 2d at 341.

Accordingly, both this court and the United States Supreme Court have closely limited the application of the rationale expressed in *Roper*, *Graham*, and *Miller*, invoking it only in the context of the most severe of all criminal penalties. A prison term totalling 36 years for a juvenile who personally committed three counts of aggravated criminal sexual assault does not fall into that category.  We decline defendant's invitation to extend the Supreme Court's eighth amendment rationale to the facts of this case." (Emphasis omitted.)  *Patterson*, 2014 IL 115102, ¶¶ 107-10.

¶ 42     We note, as discussed by this court in *In re Shermaine S.* (*In re Shermaine S.*, 2015 IL App (1st) 142421, ¶¶ 32-34), that our supreme court expressed reservations regarding the sentencing court's lack of discretion in crafting a sentence.  It stated:

"We do, however, share the concern expressed in both the Supreme Court's recent case law and the dissent in this case over the absence of any judicial discretion in Illinois's automatic transfer provision.  While modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions (see, *e.g.*, *Roper*, 543 U.S. at 569-70; *infra* ¶ 156), the automatic transfer provision does not.  Indeed, the mandatory nature of that statute denies this reality.  Accordingly, we strongly urge the

General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases." *Patterson*, 2014 IL 115102, ¶ 111.

¶ 43   Similar reconsideration may be necessary in the context of the Act's violent juvenile offender provision. As the law stands today, however, we find *In re M.G.* is well-reasoned and unchanged by the *Roper*, *Graham*, *Miller* line of cases, and we see no reason to depart from its holding that the violent juvenile offender provision of the Act does is not violative of due process. *In re M.G.*, 301 Ill. App. 3d at 407.

¶ 44   The equal protection claim reasoning from *In re M.G.* also applies to the case at bar. Specifically, this court found in *In re M.G.*:

"The Violent Juvenile Offender Act has the apparent purpose of protecting society from an individual who has committed two serious violent offenses involving the use or threat of physical force or violence against an individual or possession or use of a firearm. To further its purpose, the legislature determined that a violent juvenile offender should be confined until the age of 21. Like the Habitual Juvenile Offender Act, the interest in protecting society is compelling in cases involving such serious juvenile offenders, and we do not find the disparity resulting from the mandatory disposition to invalidate the statute." *In re M.G.*, 301 Ill. App. 3d at 409.

¶ 45   In *Chrastka*, our supreme court expressly rejected the claim that a juvenile is denied equal protection solely because his confinement until age 21 might be longer than another individual's term for the same offense. Specifically, the court stated:

"[W]e believe that the interest in protecting society from the habitual juvenile offender has, through experience, proved to be as compelling as the interest in protecting society from the habitual adult offender, and the broad authority of State legislatures to deal with adult recidivists is well recognized (*Rummel v. Estelle* (1980), 445 U.S. 263 \*\*\*; *Spencer v. Texas* (1967), 385 U.S. 554, 559-560 \*\*\*). We do not believe that the fortuitous disparity of the terms of confinement of habitual juvenile offenders which results from the variance in age of such individuals serves to invalidate the means chosen to effectuate the purpose of the Act. 'The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.' (*Williams v. Illinois* (1970), 399 U.S. 235, 241 \*\*\*). And as stated in *Skinner v. Oklahoma ex rel. Williamson* (1942), 316 U.S. 535, 539-40 \*\*\*, 'Under our constitutional system the States in determining the reach and scope of particular legislation need not provide "abstract symmetry." *Patsone v. Pennsylvania* (1914), 232 U.S. 138, 144. They may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience.' " *Chrastka*, 83 Ill. 2d at 81.

¶ 46    Similar to *Chrastka*, respondent here claims the VJO provision fails to account for an age difference among juveniles who are designated as violent juvenile offenders and argues that this "disparate treatment" is irrational and unconstitutional. Our supreme court, however, rejected a nearly identical claim in *Chrastka*, and we do here, as well. Where there need not be "absolute symmetry" in sentencing, and where the legislature has clearly expressed that the purpose of the Act is the rehabilitation of the minor as well as

"promot[ing] a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law and equip juvenile offenders with competencies to live responsibly and productively" (705 ILCS 405/5-101 (West 2012)); and where our supreme court has instructed that the *Roper*, *Graham*, and *Miller* decisions are closely limited to the "most severe of all criminal penalties" such as life without parole (*Patterson*, 2014 IL 115102, ¶ 110), we find no violation of equal protection here.

¶ 47                     b.  Eighth Amendment and the Proportionate Penalties Clause

¶ 48          Next, relying on the Supreme Court's decision in *Miller*, respondent contends that the VJO provision is an unconstitutional violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) as well as the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).  The VJO provision requires that, once the predicate offense for VJO status has been proven, the court *shall* commit the minor to the DOJJ until his 21st birthday.  705 ILCS 405/5-820 (West 2012).  Respondent argues that the mandatory nature of this sentencing structure violates both the eighth amendment and the proportionate penalties clause because it removes the trial court's discretion in sentencing minors who are subject to this provision.

¶ 49          Statutes carry a strong presumption of constitutionality.  See *Greco*, 204 Ill. 2d at 406; accord *Malchow*, 193 Ill. 2d at 418.  If reasonably possible, a court must construe the statute so as to uphold its constitutionality and validity.  *Greco*, 204 Ill. 2d at 406; *Cosby*, 305 Ill. App. 3d at 224.  The party challenging the statute's constitutionality has the burden of demonstrating its invalidity.  *Greco*, 204 Ill. 2d at 406.  "Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the

statute would be invalid under *any* imaginable set of circumstances. The invalidity of the statute in one particular set of circumstances is insufficient to prove its facial invalidity." (Emphasis in original.) *In re M.T.*, 221 Ill. 2d at 536-37.

¶ 50    The eighth amendment prohibits, in pertinent part, the imposition of "cruel and unusual punishments." U.S. Const., amend VIII. The eighth amendment applies to the States through the fourteenth amendment. *Roper*, 543 U.S. at 560. "The eighth amendment, as applied to the states through the fourteenth amendment, prohibits the imposition of cruel and unusual punishment for criminal offenses that are disproportionate in relation to the offense committed or the status of the offender." *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 17. Article I, section 11 of the Illinois Constitution, commonly known as the proportionate penalties clause, provides in pertinent part that "[a]ll penalties shall be determined *** according to the seriousness of the offense." Ill. Const. 1970, art. I, § 11. "[T]he Illinois proportionate penalties clause is co-extensive with the eighth amendment's cruel and unusual punishment clause ***." *Patterson*, 2014 IL 115102, ¶ 106 (citing *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006)).

¶ 51    The First Division of this court recently addressed and rejected this precise argument in *In re Isaiah D.*, 2015 IL App (1st) 143507. In that case, the juvenile Isaiah had been adjudicated an habitual juvenile offender (HJO) and a violent juvenile offender, and sentenced pursuant to the mandatory sentencing provisions of the Act to the DOJJ until the age of 21. *In re Isaiah D.*, 2015 IL App. (1st) 143507, ¶ 1; 705 ILCS 405/5-815, 5-820 (West 2012). On appeal, the juvenile raised a number of issues, the pertinent one to this cause being a constitutional challenge to the VJO statute. *In re Isaiah D.*, 2015 IL App. (1st) 143507, ¶ 2. The juvenile argued that the mandatory sentencing provisions of both the VJO

provision and the HJO provision under which he was sentenced were an unconstitutional violation of the eighth amendment of the United States Constitution, as well as the proportionate penalties clause of the Illinois Constitution because the mandatory nature of the provisions "removes the trial court's discretion in sentencing minors." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 51.

¶ 52      The court initially noted that our supreme court has held that neither the eighth amendment nor the proportionate penalties clause apply to juvenile proceedings initiated by a petition for adjudication of wardship because "a juvenile adjudication of wardship was not criminal in nature and did not impose 'punishment' within the meaning of the eighth amendment and proportionate penalties clause." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 52 (citing *In re Rodney H.*, 223 Ill. 2d at 520-21). The court noted, nonetheless, that even if those constitutional provisions did apply, established Illinois precedent still rejects the juvenile's arguments. *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 52.

¶ 53      Just as respondent in the case at bar relies on *Miller* for his eighth amendment challenge, so, too, did the juvenile respondent in *In re Isaiah D*. The court rejected this reliance, stating:

> "[R]espondent relies on *Miller v. Alabama*, [citation], which held that imposition of mandatory life sentences without the possibility of parole for persons under the age of 18 at the time of their crimes violates the eighth amendment. [Citation.] However, we have specifically rejected a juvenile's reliance on *Miller* to challenge the continuing validity of *Chrastka*. See *Shermaine S.*, 2015 IL App (1st) 142421, ¶¶ 21-25; *A.P.*, 2014 IL App (1st) 140327, ¶¶ 18-22. In particular, we have found that *Miller* is distinguishable because it involved defendants who

committed crimes as juveniles but were charged and convicted in the adult court systems. [Citation.] Moreover, we have noted that *Miller* 'did not hold that the eighth amendment prohibited *any* mandatory penalties for juveniles, only mandatory natural life sentences without the possibility of parole.' (Emphasis in original.) [Citation.] Thus, we have concluded that *Miller* is 'factually distinguishable and does not support deviating from precedent established in *Chrastka*, which, as an appellate court, we are required to follow.' *Shermaine S.*, 2015 IL App (1st) 142421, ¶ 25. In this case, respondent urges that both *A.P.* and *Shermaine S.* were wrongly decided, but raises no new argument to warrant departing from those decisions. Thus, we again conclude that *Chrastka* remains binding and reject respondent's eighth amendment challenge to the HJO and VJO mandatory sentencing provisions." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 56.

¶ 54        The court then considered and rejected the juvenile's proportionate penalties argument, finding that, where our supreme court has stated that the " 'Illinois proportionate penalties clause is co-extensive with the eighth amendment's cruel and unusual punishment clause,' " (*In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 58 (quoting *Patterson*, 2014 IL 115102, ¶ 106, citing *In re Rodney H.*, 223 Ill. 2d at 518)), "our rejection of respondent's eighth amendment challenge pursuant to our supreme court's decision in *Chrastka* would likewise compel rejection of his proportionate penalties argument." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 58. The court stated:

"In fact, we recently applied that logic in rejecting a proportionate penalties challenge: '[B]ecause in *Chrastka*, our supreme court held that sentencing a

habitual juvenile offender to a mandatory minimum sentence *** did not violate the eighth amendment and the proportionate penalties clause provides coextensive protections, we also reject [the juvenile's proportionate penalties] challenge to the habitual juvenile offender provision under our state constitution." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 58 (quoting *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 31).

¶ 55      Finally, the *Isaiah D.* court very specifically extended the reasoning in *A.P.* and *In re Shermaine S.*, by which those courts rejected constitutional challenges to the HJO mandatory sentencing provision, to the VJO mandatory sentencing provision:

"We recognize that, although our decisions in *A.P.* and *Shermaine S.* [on which the court relied] concerned challenges only to the HJO mandatory sentencing provision in section 5-815 of the Juvenile Court Act, respondent here challenges both that provision and its VJO counterpart in section 5-820 of the Juvenile Court Act. [Citation.]   However, respondent's arguments are identical with respect to both provisions, and he has offered no persuasive reason to distinguish his case from the identical eighth amendment and proportionate penalties challenges that our court has rejected with respect to the HJO statutory provision mandating commitment until the age of 21.  We see no reason why our decisions rejecting the same challenges to the HJO provision do not apply with equal force to the equivalent VJO provision.  Accordingly, we conclude that respondent's [eighth amendment and proportionate penalties] arguments with respect to both the HJO and VJO mandatory sentencing provisions of the Juvenile Court Act must fail." *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 61.

¶ 56        We find *In re Isaiah D*. well-reasoned and on-point. We agree that the reasoning from the precedent regarding challenges to the HJO mandatory sentencing provision is relevant to our analysis of the present constitutional challenges to the VJO mandatory sentencing provision. We see no reason to deviate from the determination in the *In re Isaiah D*. opinion that the VJO mandatory sentencing provision of the Act does not violate the eighth amendment of the United States Constitution nor the proportionate penalties clause of the Illinois Constitution. We therefore reject respondent's arguments in this regard.

¶ 57                              B. As-Applied Constitutional Challenge

¶ 58        Respondent also makes an as-applied challenge to the VJO provision, arguing that his due process rights, guarantees of equal protection, and eighth amendment protections were violated where the trial court was unable, because it was constrained by the mandatory VJO sentencing requirements, to consider respondent's personal circumstances, including his good behavior while incarcerated, his youth, and his rehabilitative potential when crafting respondent's sentence. He specifically points out that the crime for which he was adjudicated delinquent in the case at bar was a "non-violent incident;" and that, while in juvenile incarceration pending trial, respondent "dedicated himself to reforming and conforming his conduct to society's expectations for a young man," has earned the respect of his peers and the jail staff, has "shirked gang activity," has earned good grades, and has participated in fine arts and behavioral management. He believes the trial court should have been free to consider these points when crafting his sentence, rather than being bound by the mandatory sentencing requirements of the VJO provision.

¶ 59        In an as-applied challenge to a statute, "the party challenging the statute contends that the application of the statute in the particular context in which the challenger has acted, or in

which he proposes to act, would be unconstitutional." *People v. Brady*, 369 Ill. App. 3d 836, 847 (2007). "An 'as-applied' challenge requires a party to show that the statute violates the constitution as the statute applies to him." *Brady*, 369 Ill. App. 3d at 847. Our supreme court has stated:

> " 'A court is not capable of making an "as applied" determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional "as applied" is premature. [Citations.] Nor would it be appropriate for this court, *sua sponte*, to consider whether [a] statute has been constitutionally applied since we, as a reviewing court, are not arbiters of the facts." *People v. Mosley*, 2015 IL 115872, ¶ 47 (quoting *In re Parentage of John M.,* 212 Ill. 2d 253, 268 (2004)).

¶ 60 The State argues, and we agree, that it would be improper for this court to render a decision on the merits of this argument in light of the lack of evidence before us, where this issue was not raised in the trial court and there was no evidentiary hearing or findings of fact as to this issue. Respondent's constitutional claims, therefore, are limited to the VJO provision's facial validity. See, *e.g.*, *Mosley*, 2015 IL 115872, ¶ 48 (citing *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 228 (2010) ("When there has been no evidentiary hearing and no findings of fact, the constitutional challenge must be facial" (citing *In re Parentage of John M.*, 212 Ill. 2d at 268))).

¶ 61 iii. The Confrontation Clause and the One-Act, One-Crime Doctrine

¶ 62 Next, respondent contends that the admission by the State at trial of a certification alleging respondent's lack of a valid FOID card in support of his adjudication of AUUW (No

FOID) was testimonial and violated his right to confrontation under *Crawford v. Washington*, 541 U.S. 36, 43 (2004). Specifically, respondent argues that the admission of the certification, which was prepared by a non-testifying witness, violated his constitutional right of confrontation under the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). Respondent contends that, because of this alleged confrontation violation, we should reverse his adjudication for AUUW (No FOID).

¶ 63 In the alternative, respondent contends he was adjudicated delinquent for two counts of AUUW (one based on lack of a valid FOID card and the other based on his age) for but one single act. Because these adjudications are based upon the same physical act of possessing a single firearm, the less serious of the two adjudications should be vacated.

¶ 64 Our supreme court has instructed that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." *In re E.H.*, 224 Ill. 2d 172, 178 (2006) (on review of case regarding a juvenile delinquency, our supreme court admonished reviewing court below not to reach confrontation issue where it was possible to decide the issue on nonconstitutional grounds). In the case at bar, the State urges us to determine that respondent was improperly adjudicated delinquent on two counts for a single act. It suggests that we avoid the constitutional issue, vacating the AUUW count based on lack of a valid FOID card, and thereby deciding the issue on nonconstitutional grounds. We first consider the one-act, one-crime issue.

¶ 65 Under the one-act, one-crime doctrine, multiple convictions may not be based on the same physical act. See *People v. Miller*, 238 Ill. 2d 161, 165 (2010); *People v. King*, 66 Ill. 2d 551, 566 (1977). If the same physical act forms the basis for two separate offenses charged, a defendant could be prosecuted for each offense, but only one conviction and

sentence may be imposed. *People v. Segara*, 126 Ill. 2d 70, 77 (1988). "[I]f a defendant is convicted of two offenses based upon the same single physical act, the conviction for the less serious offense must be vacated." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). The one-act, one[-]crime doctrine applies to juvenile adjudications of delinquency. *In re Samantha V.*, 234 Ill. 2d 359, 375 (2009). "Whether a conviction should be vacated under the one-act, one-crime doctrine is a question of law which the court reviews *de novo*." *In re Angel P.*, 2014 IL App (1st) 121749, ¶ 63.

¶ 66    Here, although respondent concedes that he waived this issue by failing to object at trial, we review one-act, one-crime issues pursuant to principles of plain error. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004) (a violation of the one-act, one-crime doctrine affects the integrity of the judicial process, thereby satisfying the second prong of the plain error analysis and justifying our consideration).

¶ 67    Turning then to the merits of this issue, we initially note that the State agrees with respondent that one adjudication of delinquency should be vacated. Here, the same physical act, that is, respondent's possession of the handgun on January 31, 2013, formed the basis for the two adjudications of delinquency. We therefore agree with the parties that, under the one-act, one-crime rule, respondent should be adjudicated delinquent under a single count of the AUUW statute. Specifically, respondent "should be sentenced on the most serious offense and the less serious offense should be vacated." *Samantha V.*, 234 Ill. 2d at 379.

¶ 68    "In determining which offense is the most serious, we are instructed to consider the plain language of the statutes, as common sense dictates that the legislature would prescribe greater punishment for the offense it deems the more serious." *Samantha V.*, 234 Ill. 2d at

379. Here, however, both adjudications are Class 2 felonies, and both adjudications carry the same sentence because respondent was adjudicated a violent juvenile offender.

¶ 69    "If the punishments are identical, we are instructed to consider which offense has the more culpable mental state." *Samantha V.*, 234 Ill. 2d at 379. In this case, however, the mental states are also identical. We find the Second Division of this court's resolution of a similar issue in *People v. Akins*, 2014 IL App (1st) 093418-B, instructive here. In that case, the defendant was convicted of four counts of AUUW, including counts for possession of a firearm on one's person or in one's vehicle without a valid FOID card, as well as possession of a firearm on the public way. *Akins*, 2014 IL App (1st) 093418-B, ¶ 3. The defendant appealed, arguing in pertinent part that his convictions for AUUW based on possession of a firearm on his person or in his vehicle without a valid FOID card and for possession of the same firearm on the public way violated the one-act, one-crime prohibition of multiple convictions for the same physical act. *Akins*, 2014 IL App (1st) 093418-B, ¶ 17. The court determined that there was, indeed, a one-act, one-crime problem, as the two counts were for the same physical act. *Akins*, 2014 IL App (1st) 093418-B, ¶ 19. Like the case at bar, however, the punishments and the mental states for both counts were identical. *Akins*, 2014 IL App (1st) 093418-B, ¶ 19. The court resolved the issue, noting:

> "Both offenses are Class 4 felonies and have the same mental state. However, count II, possession of a firearm on one's person or in a vehicle without a valid FOID card, is arguably the less serious offense. Possessing a firearm on the public way without a valid FOID card is potentially more dangerous because of the likelihood of interaction with other people and the possibility of injuring others. Accordingly, we vacate defendant's conviction under count II.

Defendant's conviction under count IV remains." *Akins*, 2014 IL App (1st) 093418-B, ¶ 19.

¶ 70    In similar fashion, and in recognition that our aim as an appellate court is to decide issues in a nonconstitutional manner whenever possible (*In re E.H.*, 224 Ill. 2d at 178-81), we find in this particular circumstance that count II, possessing a firearm while under age 21 is arguably the more serious offense, as respondent had only just turned 16 years of age at the time of the crime, is admittedly affiliated with a gang, and has a history of prior run-ins with the law and adjudications of delinquency based on gun crimes. Accordingly, we vacate respondent's adjudication under count I (No FOID). Respondent's adjudication under count II remains.

¶ 71                        III. CONCLUSION

¶ 72    For all of the foregoing reasons, we vacate count I pursuant to the one-act, one-crime rule. We affirm the decision of the circuit court of Cook County in all other respects.

¶ 73    Affirmed in part; vacated in part.